# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Klausner Lumber One LLC, | Case No. 20-11033 (KBO) |
| Debtor.[1] | |

## DECLARATION OF MICHAEL FREEMAN IN SUPPORT
## OF DEBTOR'S BANKRUPTCY FILING

I, Michael Freeman, being duly sworn, declare under penalty of perjury as follows:

1.  I am the appointed Chief Restructuring Officer ("CRO") of Klausner Lumber One LLC ("KL1" or the "Debtor") in this Chapter 11 case (the "Bankruptcy Case"). I am a managing director with Asgaard Capital, LLC ("Asgaard"). It is my understanding that the Debtor will soon file a motion for entry of an order authorizing the Debtor to retain and employ Asgaard, including my appointment as CRO, to assist the Debtor in the management of its affairs, its sale, and any subsequent wind-down actions, whether pursuant to a plan or otherwise.

2.  I am over the age of 18 and am authorized to submit this Declaration. If called as witness, I could and would competently testify to the facts set forth in this Declaration.

3.  As part of my employment and services for KL1, I am generally familiar with some of the Debtor's prior history, and am familiar with its recent history, and the status of its assets, financial affairs, operations, and books and records. That said, due to my and Asgaard's recent retention and the rather unique circumstances preceding this case as described below, some of this Declaration is based only on documents I have reviewed, documents reviewed by KL1's counsel and other professionals (also all newly appointed), a plant visit and discussions

---

[1] The last four digits of the Debtor's EIN is 9109. The Debtor's mailing address is 17152 46th Trace, Live Oak, FL 32060.

1

with former employees, and various conversations among Asgaard and the principals of KL1 and certain of its affiliates (and such parties' German counsel).

4.      On April 30, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      The purposes of this case (the "Bankruptcy Case") are as follows:

(a)     to protect, via the automatic stay, a new, modern-style large lumber mill in Live Oak, Florida, that was recently (and abruptly) shuttered in an uncontrolled fashion;

(b)     to arrange for the retention of a new group of independent professionals and an independent director to preserve the Debtor's assets, and work to maximize value by selling such assets for the benefit of creditors, building consensus through trust, a lack of connection to any prior parties or their actions, open communications, and fair dealing with all parties;

(c)     to complete such sale, preventing a very large investment from completely going to waste or being dismembered by individual creditors, and at the same time bringing renewed employment to a part of rural Florida; and

(d)     to distribute such proceeds to creditors.

**Background of the Debtor**

6.      This is an unusual case. The Debtor was formed several years ago, along with a sister entity Klausner Lumber Two LLC ("KL2"), to build two state-of-the-art sawmills: the Debtor KL1 in the aptly-named town of Live Oak, in north-central Florida, an area known for its abundant timber and agricultural resources, and KL2 in eastern North Carolina, which had similar natural advantages for a large, modern timber mill.

7.      KL1 and KL2 were to be the new, United States operations of Austria's Klausner family of companies. Prior to the Great Recessions, such companies were collectively the sixth largest sawmill operation in the world. I am told that several years ago, the Klausner companies decided to expand into the United States via the formation and construction of KL1 and KL2, as well as miscellaneous affiliates to support such US operations.

8.      KL1 and KL2 were to be the first new sawmills built in the United States for some time. Using European technology that would result in efficiencies of operations and production, and far greater utilization / less wastage of raw materials, the operations would, if successful, have a competitive advantage over traditional East Coast lumber mills. In addition, KL1 and KL2 would be located in rural, timber-rich areas, surfeit with local raw materials, and a populace that would greatly benefit from new, large employers in the region.

9.      In light of this, over $147 million was invested in KL1 to build it from the ground up and render it operational. Such funds were raised through shareholder and related-party loans and capital, and an indirect investment – alleged to be as much as $49.5 million, although I am still finalizing such figures – by "EB-5" investors in KL1's secured lender, an entity named Florida Sawmills L.P. ("<u>Florida Sawmills</u>"). Florida Sawmills is an affiliate of KL1.[2] In addition, I understand that Florida governmental agencies provided several million dollars in direct and indirect grants, support, and infrastructure (building out roads, water, power substations, etc.). Such governmental support helped KL1's efforts to become operational, and was provided presumably with the hopes and expectations that KL1 would generate a substantial number of jobs in an area that historically did not have large local employers.

---

[2]  I understand that a larger amount was invested in KL2, through a similar structure of insider and affiliate loans and capital, and EB-5 investors in KL2's lender, which is Carolina Sawmills, L.P. Moreover, I understand the local government for KL2 provided over $7.7 million in direct and indirect support for KL2, including building out the substantial surrounding infrastructure for a plant of KL2's size and scope.

10. After construction was complete, KL1 began production in March of 2015, and built up to annual production of over 240 million board feet of lumber. However, construction and production had been delayed, resulting in cost overruns and a drain on liquidity. Production, sales, and distribution thereafter were not as successful as hoped, resulting in KL1 needing additional funds, and accruing trade debt.

11. KL1's efforts to raise new capital were not successful. I am told that senior management, all European individuals experienced in sawmill operations and financial aspects of KL1, spent 2019 and then started 2020 considering various liquidity, sale, and capital raising options, all of which were challenging. In addition, by 2020 (or perhaps earlier), KL1's foreign related parties appeared to be having financial issues of their own. That recently culminated in bankruptcy proceedings being filed by two related parties to KL1 on April 15, 2020, Klausner Nordamerika Beteiligungs GmbH and Klausner Trading International GmbH,[3] in Austria's Innsbruck Regional Court. It has been reported in the media that Dr. Stefan Geiler was appointed as administrator for both of these Austrian companies, but neither I, Asgaard, nor any of KL1's professionals have been contacted by or had any dealings with Dr. Geiler. (Importantly, KL1 was still able to obtain all proper corporate authority for this chapter 11 bankruptcy proceeding.)

12. In any event, by early 2020, KL1's and its related parties' distress had left KL1 on very unsound financial footing, and so remedial steps (if any) would have to be taken quickly. As 2020 progressed, it appeared that KL1 would have to commence some type of insolvency or liquidation proceeding.

---

[3] Klausner Trading International GmbH is listed on KL1's list of twenty largest unsecured creditors, showed as being owed $744,287.58 on an unsecured basis.

13. In March of 2020, the impact of COVID-19 on KL1 and the national pandemic that followed fully manifested itself, with a suddenness unforeseen to virtually all of America. This rapid escalation of COVID-19's spread, and concerns about COVID-19's consequences, appeared to eliminate any plans for a controlled liquidation or bankruptcy. I am told that the KL1 management team and certain skilled engineers and operators were concerned about COVID-19 and that they would become stranded in the United States due to travel restrictions. In addition, they would have no ability to operate KL1 remotely. The liquidity problems at KL1 were acute, and KL1's foreign related parties – long the source of financial support for KL1's operations – were unable to provide any further funds, whatsoever. Moreover, KL2 had shuttered some months before, raising fears among trade creditors and the industry. Finally, the EB-5 investors in KL1's affiliate lender, Florida Sawmills, had been growing restless, asserting that they had not been provided with adequate information for some time, they were not obtaining a return on their investments in Florida Sawmills, that Florida Sawmills was not acting in their interests due to its affiliated status with KL1, and some of them apparently had not obtained their "green cards," an important component to providers of EB-5 funds.

14. On or about March 16, 2020, KL1's entire management team and various engineers and operators returned to Europe, in order to avoid a dangerous health situation in the US and potential long-term travel restrictions.

15. Having no ability to operate, no financing, and no liquidity, KL1's operations were shuttered immediately, and there was no controlled liquidation, bankruptcy filing, or the like. Employees were informed (or learned) that they should no longer come to work; it has been alleged they did not receive their final paychecks.[4] Insurance lapsed shortly thereafter. There

---

[4] On March 31, 2020, various KL1 employees filed a class action lawsuit in Florida against KL1 and other defendants, alleging violations of the Worker Adjustment Notification and Retraining Notification Act and

were no security personnel for this expensive, valuable plant. A tax sale had been scheduled for mid-May, due to past due *ad valorem* taxes. KL1's corporate counsel, having no decisionmaker left at the local helm, stated that it had received no responses to multiple entreaties to management, and was owed substantial amounts, provided written notice that it would disengage from all matters. Trade creditor lawsuits had been filed, and were progressing to judgment, unopposed; KL1 had no ability to defend such actions.

16. Unfortunately, the lack of any traditional lender to which to abandon these problems so it could protect its collateral left KL1's operations financially crippled. All possible value for any and all creditors and other constituents was on the precipice of being lost, despite the over $147 million invested by related parties (and by EB-5 investors in such parties), millions of local government spending and support, and substantial amounts owed to trade creditors.

17. Shortly thereafter, Asgaard – a complete stranger to this situation in March of 2020 – was put in contact with KL1's senior managers in Europe. Asgaard realized the opportunity for creditors here, and the terrible risk to creditor recoveries if this dire path continued. Asgaard assembled a proposed team including new counsel for KL1, and a new investment banker to KL1, for KL1 to consider. A few weeks later, a new proposed independent director for KL1 was approached by such professionals – he was also fresh to the situation and thus free from any challenges or creditor suspicion. **Independence and adherence to proper corporate governance were paramount** – this tale has left many creditors, the EB-5 investors in Florida Sawmills, governmental units, and other parties in interest feeling very wronged by KL1. In order for any bankruptcy process to succeed, creditors and parties in interest must feel

---

related statutes. KL1 has not responded, nor do I think any other defendants have. Notice of the filing of this case and the imposition of automatic stay is being provided immediately to the plaintiffs' counsel in that action, by KL1's newly hired special Florida litigation counsel.

they are dealing with "honest brokers," empowered by Bankruptcy Court orders, on notice to all, and following traditional corporate law (including the new independent director) to monetize this very substantial asset, free from any perceived control or influence, for the benefit of creditors and other constituents.

18. Over the course of April, Asgaard and the proposed KL1 professionals invested hundreds of uncompensated hours and related expenses learning about the assets, KL1's operations, its history, the various litigation, its creditors, secured status of numerous parties, and the like. I visited KL1, met with former employees, familiarized myself with the operations, and identified further challenges and potential solutions. Asgaard, myself, and the other new professionals diligently pursued pre- and post-petition financing sources – no asset, no matter how valuable, can remain without any insurance, any security, any skeleton crew of employees to properly care for the plant, any money for utilities, or any of the other things that prevent a large industrial operation from going to waste. The process was hard (and at times seemed insurmountable), due to a lack of historic knowledge, concern of potential new lenders as to the value of this derelict asset, constant surprises, progressing litigation that KL1 could not address, and the like. In addition, an action to appoint a receiver for KL1 (and of Florida Entrepreneur, LLC, which is the general partner of the affiliated lender, Florida Sawmills) had been filed in Florida, by the parties which made EB-5 investments in Florida Sawmills.[5]

19. A bankruptcy stay was desperately needed. But with no buyer, no funds, no financing, no operations, no insurance, no new fiduciaries, and no plan, there could be no hope. Asgaard and I approached new lenders to provide a small pre-petition loan, simply to place insurance and hire some guards, but they would not, given the dire situation. Despite this,

---

[5] As with the WARN Act lawsuit referenced above, notice of the filing of this case and the imposition of automatic stay is being provided immediately to the plaintiffs' counsel in that action.

Asgaard and the proposed KL1 professionals toiled throughout April, for free (and of course have waived all pre-petition fees and expenses).

20. Approximately ten days ago, light appeared, from various directions. KL1's newly-hired investment banker, Cypress Associates, well-versed with distress and the sale of industrial operations, began to obtain interest from large, well-capitalized, competing sawmills in North America. Two potential lenders became very serious about providing a modest, but sufficient, post-petition loan. KL1 maintained its corporate control, as the action to appoint a receiver was not progressing (likely for reasons related to COVID-19, as neither KL1 nor Florida Entrepreneur LLC had any ability to defend such lawsuit and thus took no action), and the Austrian insolvency proceedings had not touched KL1 or its governing individuals. Florida Sawmills (again, that is KL1's affiliated lender), after consulting with its own counsel in Germany, was willing to subordinate its liens and claims to the expected professional fees and administrative claims of a Chapter 11, including the proposed post-petition financing. Florida Sawmills further provided a partial subordination for the benefit of unsecured creditors, and other written, binding concessions critical to a sale, all of which will be described in a forthcoming motion next week, to approve bidding procedures and a sale of KL1's assets under section 363 of the Bankruptcy Code.

21. Also over the last ten days, Asgaard negotiated aggressively with the two potential new post-petition lenders. We wanted to ensure an adequate post-petition budget (except for professional fees, most of which will have to be accrued during the Bankruptcy Case, as will be set forth in the budget to be filed soon with the motion to approve such financing), and sufficient time for a proper sale process. This succeeded, and the financing terms, timing, and budget will allow a sale process to proceed. And finally, in the past week, more buyers have

expressed interest, and executed confidentiality agreements to obtain information. After weeks of desperate effort, on a budget of $0, Asgaard and KL1's new professionals had sown the seeds for a transparent, adequately funded, value-maximizing sale process designed to obtain a return to all creditors and constituents.

22. During the week of April 26, 2020, KL1 finalized a term sheet with a "new money," wholly unaffiliated lender Asgaard had located, to provide post-petition financing, under a completed budget which Asgaard, myself, and the other new KL1 professionals had spent weeks preparing. That term sheet has now been signed. With a term sheet for such post-petition funding – subject to this Court's approval – the pieces are now coming together. Insurance was arranged and is being bound immediately. I was appointed as CRO effective as of the Petition Date, and the independent director has been appointed. In the coming days, all first day motions will be prepared and filed, which will allow for a properly functioning Chapter 11 case, and a first day hearing will be sought for approximately 7-10 days from today (subject to this Court calendar, of course). I will also supplement this Declaration to add further factual support for such first day motions.

23. As indicated above, this is an unusual case. Very large investments and extensions of credit were made over the years – by unsecured creditors, related parties, an affiliated lender (and EB-5 investors in such lender), government agencies, and many others – to get to a functioning, modern business, which I believe has substantial value in the marketplace. Further investments of unpaid time, toil, expense, and stress were made by Asgaard and the dedicated new professionals of KL1. KL1's new post-petition lender has shown tremendous faith and invested time in studying KL1's assets, in a process and an operation that six weeks ago had little hope. As a result, despite this period of rudderless operations, no backstop for creditors

through insurance, no pre-existing unaffiliated secured lender (such as a traditional bank) that could step in to protect its collateral, or any safety net whatsoever, I believe we have the keys to a process that will preserve value through this chapter 11 case, avoid the piecemeal dismemberment of KL1 by a handful of creditors or other parties in interest in a classic "race to the courthouse," bring a plant back to operation in an area of the country that needs it, and provide a return to creditors and other constituencies consistent with the intent and specific provisions of the Bankruptcy Code.

*[Remainder of this page intentionally blank.]*

Dated: May 1, 2020

/s/ Michael Freeman
Michael Freeman
KL1 Chief Restructuring Officer
Asgaard Capital